DLA PIPER LLP (US)
LISA TENORIO-KUTZKEY, Bar No. 205955
ltk@dlapiper.com
MANDY CHAN, Bar No. 305602
mandy.chan@dlapiper.com
555 Mission Street, Suite 2400
San Francisco, California 94105-2933
Telephone:   415.836.2500
Facsimile:   415.836.2501

Attorneys for Defendant Laith Salma

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 3:11-cr-00801-CRB |
| Plaintiff, | **DEFENDANT LAITH SALMA'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE PURSUANT TO 18 U.S.C. § 3553** |
| v. | |
| LAITH SALMA, | Judge:       Hon. Charles R. Breyer |
| Defendant. | Date:        April 26, 2018 |
| | Time:        1:30 p.m. |
| | Courtroom:  6, 17th Floor |

**TABLE OF CONTENTS**

**Page**

I. SUMMARY OF ARGUMENT ................................................................................................ 1
II. BACKGROUND ..................................................................................................................... 2
III. MOTION FOR DOWNWARD VARIANCE ......................................................................... 2
   A. Commitment to Cooperation & § 5K1.1 Motion ................................................. 3
      1. Mr. Salma's History of Cooperation ............................................................. 3
      2. Government's § 5K1.1 Motion ...................................................................... 5
   B. FULL AND COMPLETE ACCEPTANCE OF RESPONSIBILITY ..................... 6
      1. Mr. Salma's Acceptance of Responsibility ................................................... 6
      2. Probation's Recommendation ....................................................................... 7
   C. NEED FOR MEDICAL CARE ............................................................................... 7
      1. Mr. Salma's Medical History ........................................................................ 7
      2. Probation's Recommendation ....................................................................... 8
   D. PERSONAL HISTORY & CHARACTERISTICS ................................................. 8
      1. Mr. Salma's Background ............................................................................... 8
      2. Mr. Salma's Volunteer Activities .................................................................. 9
      3. Probation's Recommendation ..................................................................... 12
IV. NO UNWARRANTED SENTENCING DISPARITIES ..................................................... 12
V. CONCLUSION ..................................................................................................................... 13

DLA Piper LLP (US)
San Francisco

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Koon v. United States*,
  518 U.S. 81, 113 (1996) .................................................................................................................12

*Pepper v. United States*,
  562 U.S. 476..................................................................................................................................12

*United States. v. Giraudo*,
  Case No. 3:14-cr-00534-CRB ........................................................................................................4

*United States v. Silva*,
  Case No. 4:14-cr-00002-PJH, Dkt. 46 .........................................................................................13

*United States v. Zepernick*,
  Case No. 4:14—cr-00512-PJH, Dkt. 33........................................................................................13

*Williams v. People of State of N.Y.*,
  337 U.S. 241, 247 (1949) .............................................................................................................12

## STATUTES & AUTHORTIES

18 U.S.C. § 3553 ...............................................................................................................1, 2, 3, 8, 12

USSG § 3B1.1.........................................................................................................................................4

USSG § 5K1.1................................................................................................................. *passim*

DLA PIPER LLP (US)
SAN FRANCISCO

## I.     SUMMARY OF ARGUMENT

Both the Government and the Probation Office agree that Defendant Laith Salma is, in all key respects, the individual in this matter deserving of the lowest sentence of any similarly situated participant in the San Mateo foreclosure auction bid rigging scheme.

We understand that the Government intends to move for the largest § 5K1.1 departure under the U.S. Sentencing Guidelines (USSG) for Mr. Salma based on his timely and substantial assistance in its investigation: 50% off the low end of his recommended guidelines range of 12 to 18 months, for a total of 6 months. We understand that this extraordinary departure was reserved for only two individuals, including Mr. Salma. This recommendation is more than warranted as Mr. Salma was among the first to cooperate with the authorities and has been one of the most prodigious and helpful cooperators in this case.

In Mr. Salma's Presentence Report (PSR), Probation described Mr. Salma's genuine acceptance of responsibility and other unique personal characteristics, stressing that:

> It appears that [Mr. Salma] is one of the only codefendants to completely accept his wrongdoings, and followed this up by actions and has actually given back to society in an effort to make amends for what he did wrong. Due to this, the undersigned is recommending two months less time in home detention than others that are similarly situated to him.

PSR, Sentencing Recommendation, pg. 2. Working from Mr. Salma's original guidelines range of 12 to 18 months and **without** incorporating the Government's § 5K1.1 motion, Probation recommended a below-guidelines, non-custodial sentence of 4 months of home confinement.

Mr. Salma's exceptional cooperation—coupled with his full and timely acceptance of responsibility and his ongoing efforts to atone for his crime through a remarkable commitment to community service and other circumstances—merits a sentence that is equally exceptional. Mr. Salma appears before the Court and through counsel submits this Sentencing Memorandum and Motion for Downward Variance in support of his request for a sentence of 18 months of probation with no period of home confinement. Such a sentence would be consistent with the sentencing factors in 18 U.S.C. § 3553(a), would allow Mr. Salma to continue his work and volunteer activities, and would not create unwarranted sentencing disparities. Mr. Salma has

already paid the restitution recommended in the PSR and agreed by the Government, and is prepared to pay the Government's recommended fine of up to $40,000, Probation's recommended fine of $173,545, or whatever reasonable fine this Court sees fit to impose, in full on the date of sentencing.

A sentence of probation, along with the imposed restitution and fine, fairly reflects the nature and circumstances of Mr. Salma's history and offense and is "sufficient, but not greater than necessary" to serve the purposes of sentencing as set forth at 18 U.S.C. § 3553(a). If at the end of the day Mr. Salma's sentence is the very lowest of the sentences imposed in this case, then that is exactly as it should be given his personal characteristics and the extent of Mr. Salma's role in bringing this investigation to a successful completion.

## II. BACKGROUND

This Court is intimately familiar with the scheme in which Mr. Salma became involved, and we will not waste the Court's time with a rehash of those facts here, other than to note that Mr. Salma was not part of the "Big 5". PSR ¶ 16. He did not orchestrate or enforce the scheme in San Mateo County. He did not create the "rules" or enforce compliance with them. PSR ¶ 16. He became involved at auction and with the charged conduct for a period of 6 months, a time he will never forget and always regret. From the outset of this matter, Mr. Salma has done everything within his power to right his wrongs. He has offered his complete cooperation to the Government in its investigation and prosecution of others. He has taken full responsibility for his actions without blaming others, and demonstrated true remorse for the harm and damage he has caused. He has since taken his real estate skills and expertise and used them for the benefit of others in connection with various local and regional community service projects and charitable organizations. As a result, Mr. Salma has emerged at the top of the Government's and Probation's lists of those deserving one of the lowest below-guidelines sentences—a fact that speaks for itself.

## III. MOTION FOR DOWNWARD VARIANCE

The Government and Probation have identified a number of factors under 18 U.S.C. § 3553(a) that merit a significant downward departure in this matter, including Mr. Salma's exceptional cooperation, acceptance of responsibility, personal history and medical conditions,

and commitment to charitable work. For all of these reasons, Mr. Salma respectfully requests this Court to use its power under § 3553(a), to grant the Government's § 5K1.1 motion, and to impose a sentence of 18 months of probation, along with restitution and a fine.

**A.     COMMITMENT TO COOPERATION & § 5K1.1 MOTION**

Mr. Salma's cooperation began the first moment he was contacted by the FBI. As explained below and in the Government's § 5K1.1 motion, his cooperation went far above and beyond what is often categorized as "substantial assistance." Indeed, his assistance has been rated by the prosecution team as being in the very highest echelon of cooperators and deserving of the largest downward departure amongst all defendants: 50% off the low end. We respectfully request that this Court grant the Government's motion and downward depart from Mr. Salma's guidelines range accordingly.

**1.     Mr. Salma's History of Cooperation**

Mr. Salma's extraordinary cooperation with the authorities began on Day 1. On January 11, 2011, Laith sat for his first interview with the FBI and generated his first FBI 302 (4 pages). Over the course of an hour, he laid out the entire big rigging scheme at the San Mateo foreclosure auction, including detailed information about the Big 5's involvement in the conspiracy, how they kept track of and monitored the buy ins and pay outs, and how they enforced the rules. He also willingly described his own role in the scheme. At no time did Mr. Salma make excuses for his conduct or try to minimize his participation.

Mr. Salma backed up his words by action. He was among the first group of individuals to agree to plead guilty in this matter. In fact, he was the first person involved in the San Mateo auctions to plead guilty in open court. The Government has represented that Mr. Salma's timely decision to plead guilty early in the investigation was a tipping point for other defendants to do the same. He also assisted in the compliance with the Government's subpoena and identified key liability documents for production, again early in the investigation.

Following his timely plea, Mr. Salma made a deliberate decision to offer his full and unfettered assistance to the Government. He sat for his next FBI interview on April 4, 2012 (14 pages of 302). This interview, however, was not long enough given the breadth of his information

and his recollection of specific facts. As a result, he was interviewed by the Government 3 more times: on April 5, 2012 (13 pages of 302), April 18, 2012 (11 pages of 302), and April 20, 2012 (14 pages of 302). Recently, the Government requested to sit down with Mr. Salma for further questioning on whether there were facts to support an organizer and leader enhancement under USSG § 3B1.1 for two other defendants. He did so on December 5, 2017 (13 pages of 302). We suspect there are few, if any, other individual defendants in this investigation who have been interviewed as many times (total of 6 interviews) or as extensively (total 69 pages of 302s) as Mr. Salma.

Mr. Salma's information was unquestionably valuable to the Government's investigation. He provided investigative leads and evidence on 6 new properties that were previously unknown to the Government, including: (1) 611 Fairway; (2) House with Back Taxes; (3) 80 John Glen; (4) 1420 Douglass; (5) 125 Merced; and (6) Benemax. He also provided corroborating information about 12 additional properties that Government suspected—but did not have sufficient evidence to prove—were part of the bid rigging scheme, including: (1) 500 Peninsula; (2) 1012 San Gabriel #405; (3) 32 Eastgate; (4) 523-525 41st; (5) 463 Magellan; (6) 240 Willow; (7) 387 Michelle; (8) 925 Sacramento Terrace; (9) 125 Belvedere; (10) 154 Eastridge; (11) 289 Oakcrest; and (12) 205 Whiskey Hill.

The Government also relied on Mr. Salma in its prosecution of other defendants in this matter:

- The Government cited Mr. Salma's information as evidence in its opposition to a motion to suppress in *United States v. Giraudo*, Case No. 3:14-cr-00534-CRB.
- The Government requested that Mr. Salma serve as a trial witness against the remaining Big 5 defendants and testify on 9 specific properties. He was not ultimately called because, as the Court is aware, all defendants pled guilty.
- The Government also asked Mr. Salma to provide information about 10 properties to determine the applicability of a potential sentencing enhancement under USSG § 3B1.1. The specific properties discussed are notable in that Mr. Salma was the original source of information for 4 of them (611 Fairway, House with Back

Taxes, 125 Merced, and Benemax) and a corroborating source for another property (500 Peninsula), again demonstrating the importance and value of Mr. Salma's cooperation.

Separate and apart from the San Mateo big rigging investigation, Mr. Salma also provided the Government with detailed evidence of other previously unknown crimes. He described: (1) a local government corruption scheme in the Northern District of California; (2) a significant fraud against financial institutions in the Southern District of California; and (3) a new Title 15 criminal bid rigging scheme in connection with other foreclosure auctions. This information required considerable investment of Mr. Salma's time and energy but he did so because of the potential value to the Government. Based on the belief that the Government has yet to bring any charges based on Mr. Salma's information, we will not describe the details here. If requested, Mr. Salma's counsel would be happy to provide the scope of his assistance to the Court in camera.

### 2.     Government's § 5K1.1 Motion

As a result of Mr. Salma's assistance and cooperation with the investigation, the Government has moved for a substantial downward departure pursuant to USSG § 5K1.1.

To begin, the Government, Probation, and Mr. Salma all agree that Mr. Salma's adjusted total offense level is 13. PSR ¶¶ 24-34. With a Criminal History Category of I , the recommended guidelines range is a custodial sentence of 12 to 18 months. PSR ¶ 41.

In Mr. Salma's case, we understand the Government has moved for a 50% downward departure off the low end of the guidelines range for a total sentence of 6 months. This sizeable variance reflects the extent and value of Mr. Salma's assistance, which is only matched by one other defendant. It also illustrates how the Government measures Mr. Salma's contributions vis-à-vis his co-defendants. That is, it shows the Government views Mr. Salma as one of the top cooperators in the entire investigation, which is particularly noteworthy in a matter where 20 other defendants agreed to plead guilty pursuant to a plea agreement and presumably cooperated.

//
//
//

### B.  FULL AND COMPLETE ACCEPTANCE OF RESPONSIBILITY

Probation recognized that Mr. Salma is deserving of an additional variance from the sentencing guidelines in light of his full and complete acceptance of responsibility, his awareness of the harm and damage he has caused, and his dedication to correct those mistakes by giving back to society. As a result, Probation recommended "two months less time in home detention than others that are similarly situated to him." PSR, Sentencing Recommendation, pg. 2. We respectfully request that the Court accept Probation's recommendation, downward depart from the guidelines range, and sentence Mr. Salma to less time than other similarly situated defendants.

#### 1.  Mr. Salma's Acceptance of Responsibility

From the outset of the investigation, Mr. Salma fully accepted his own role in the scheme and has taken complete responsibility for his actions. He submitted a lengthy statement of his own culpability to Probation, where he stated in pertinent part:

> Yes, I absolutely accept responsibility for my offense. . . . I have regret for not following my instincts and instead choosing to rationalize bad behavior. I regret bringing harm to the beneficiaries who held these [mortgage loans]. I had depersonalized them and adopted the common view of blaming the banks for the financial crisis. If I had listened to my instincts instead of being willfully blind, I would have easily seen that these actions were wrong. I regret damaging my hard earned reputation, my family's hard-earned reputation and my children's future reputations. I am ashamed and have deep regret for having committed this offense, it's been humiliating mostly because I do not feel it represents or defines me, but now, unfortunately, it does define me. I have spent days, nights, weeks, months and now years wishing I could reverse the clock and choose a different path back in 2011. Since having made such a huge error, I have been much more conscious of the paths I take on a daily basis. There have been very few days in the last seven years that I have not regretted my actions in 2011.

PSR ¶ 22.

Mr. Salma also submitted to a presentence interview where he again accepted full responsibility for committing the instant offense. He stressed his "immense regret," but noted that he "has no one to blame but himself, which is a lot for him to carry and he needs to earn a lot of people's trust back." *Id*. When asked what influenced him to commit the offense, Mr. Salma stated that it was a "culture of normalizing the offense. But I'm the only one to truly blame. I chose to make excuses for bad behavior and I chose to listen to the wrong people." *Id*.

**2.     Probation's Recommendation**

After speaking with Mr. Salma, reviewing his supporting materials, interviewing his family members, and conducting a home investigation (PSR ¶¶ 22,46), Probation agreed that:

> [Mr. Salma] provided an Acceptance of Responsibility statement that was a very honest account of the repercussions of his criminal conduct. He truly accepted his actions and wrongdoings, and realized how what he did affected others. Unlike other participants, he did not blame large banks, or portray himself as just helping less fortunate people by being a 'Robin Hood.' It appears that [Mr. Salma] is one of the only codefendants to completely accept his wrongdoings, and followed this up by actions and has actually given back to society in an effort to make amends for what he did wrong.

PSR Sentencing Recommendation, pg. 2. As a result, Probation "recommend[ed] two months less time in home detention than others that are similarly situated to him." *Id.*

**C.     NEED FOR MEDICAL CARE**

Probation also recognized that Mr. Salma faces an unusual set of health issues that distinguishes his case from the typical cases covered by the guidelines and therefore merits a separate and unique basis for a downward variance. We respectfully request the Court accept Probation's assessment and find that Mr. Salma's need for medical care warrants an additional downward departure from his guidelines range.

**1.     Mr. Salma's Medical History**

Mr. Salma has suffered from a number of health problems throughout his life. He has sought mental health treatment for severe depression and chronic panic attacks. Since his early 20s, Mr. Salma has endured a number of painful physical ailments, including: (1) psoriasis; (2) back pain; (3) degenerative disc disease; (4) nerve damage in his feet; and (5) rheumatoid arthritis. The root cause of these afflictions—Celiac disease—went undiagnosed until 2017. Because of the substantial delay in diagnosis, Mr. Salma has sustained permanent physical injuries such as persistent back and feet pain and long-term liver damage. Now Mr. Salma must follow a regimented food diet and take daily medications and supplements in order to control his disease and maintain his current state of health. PSR ¶¶ 60-61.

Mr. Salma's physicians have verified the details of his disease and the conditions necessary to minimize future damage and injury. Specifically, Mr. Salma must live and eat in a

100% gluten-free environment. His physicians conclude that "[i]t is in my medical opinion that Mr. Salma should not be exposed to a communal living situation where there is no dedicated 100% gluten-free kitchen and living environment." PSR ¶ 60.

### 2. Probation's Recommendation

In Mr. Salma's PSR, Probation acknowledged that a "physical condition may be relevant in determining whether a departure is warranted if the condition . . . is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines." PSR ¶ 87. Probation found that Mr. Salma "suffers from serious medical issues that require a regimented treatment protocol that might be difficult to duplicate if in a custodial setting. This factor is presented to the Court to be considered for a variance below the guidelines range under 18 U.S.C. § 3553(a)(2)(d) – the need for medical care." PSR ¶ 90.

## D. PERSONAL HISTORY & CHARACTERISTICS

Finally, Probation recognized Mr. Salma's personal history and characteristics—particularly his efforts to give back to society and to devote substantial time and resources to charitable work—present an additional basis for a downward variance from his guidelines range. We respectfully request the Court recognize Mr. Salma's extraordinary commitment to community service and find that a further downward departure is warranted here.

### 1. Mr. Salma's Background

Mr. Salma is a Bay Area native who grew up in Burlingame in an "extremely close knit family." PSR ¶ 47. It was a loving household and he never went without the basic necessities. Although he experienced some difficulties outside the home, he always had the comfort of a caring immediate and extended family. Mr. Salma is now married and has three young children: Kalin (3-years old), and Nadia and Asher (1-year old fraternal twins). Since the birth of his first child, Mr. Salma has been the sole financial provider for the family. PSR ¶ 53.

Twenty-one friends, family members, business partners, and colleagues have submitted letters to the Court, which detail their views, interactions, and assessments of Mr. Salma. We highlight a handful of them here:

//

- "I have known Laith for more than 15 years and consider him a part of my family. In 2009, I was diagnosed with breast cancer and Laith not only was there to support me and my family, he was also cooking for me, making sure that I ate well and regularly. Remember, this was when he was in his 20s. A few years later, my family was attacked with a hate crime. Someone drew a swastika in front of our garage. Laith was right over at our house, again supportive, caring and thoughtful." Margaret Mak Letter, Exh. P.

- "I have been close friends with Laith for over 10 years. . . . Laith has always been there for me. He cooked and delivered food to my wife when she was recovering from cancer and other illnesses and has taken an interest in my son, offering support and advice during challenging teenage years. He has been a great support to my family." David Lichman Letter, Exh. F.

- "7 years ago, my brother Daren had a tragic accident that left him in [a] vegetative state. More than a brother, Daren was my best friend and he later passed away after a few weeks in the hospital. While in ICU, Laith came by the hospital every day to visit with . . . me and my family. He generously brought my parents food and lifted everyone's spirits with his caring sense of humor. After my brother passed, Laith would call and/or visit me at home every day to check in and talk. At a time when my other friends were sending 'thoughts and prayers' on Facebook, Laith was carving time out of his very busy schedule to stop by my house and look after my well-being. To this day, Laith still calls and writes on my brother's birthday and the anniversary of his death. No one else does." Brian Bishop Letter, Exh. N.

### 2. Mr. Salma's Volunteer Activities

In addition to supporting his friends and family, Mr. Salma has maintained a steadfast dedication to community service and charitable work. As explained by the former Director of Project Insight, "I met Laith Salma over 10 years ago. . . . I remember I asked him why he wanted to be here. He told me that he felt that he had a lot of love to give and he felt so fortunate to have been blessed with a good life that he wanted to give back. He's been giving back to our group ever since." Ben Oude Kamphuis Letter, Exh. B.

The nature and extent of Mr. Salma's charitable work and participation is detailed in the PSR and in the supporting letters. By way of example:

- **Project Insight** – For the past 11 years, Mr. Salma has volunteered at Project Insight, a therapeutic recreation program run by the City of San Francisco's Recreation and Park Department that provides a forum for visually impaired people, some of whom are mentally challenged, elderly, or deaf. Mr. Salma has

consistently dedicated his time, attention, and financial resources to the program and its participants. He has engaged in a number of activities, everything from giving "a few hugs" to funding a blind skiing trip to Tahoe to helping those in need. PSR ¶ 50.

- **Marty's Place** – Mr. Salma also regularly contributes to Marty's Place, a home for HIV positive people in San Francisco. Employing his real estate and construction skills, he personally worked on rebuilding the program's rundown house and paid contractors for several weeks to get the house repaired. It now houses at least 8 low-income individuals who are trying to get back on their feet. PSR ¶ 51.

- **Tenderloin Housing Clinic and Tenderloin Museum** – Mr. Salma also donates his time to a program that serves those with low-income housing needs in the Tenderloin. Whenever one of the residents has a non-responsive landlord or has a maintenance request, Mr. Salma steps in, completes the repairs, or otherwise returns the home to working order. PSR ¶ 51.

- **Enchanted Hills** – After the recent North Bay fires, Enchanted Hills, a camp for blind youth that is affiliated with Project Insight, sustained major damage. All ten of the children's cabins, the outhouse bathrooms, main cabin, pool pavilion, and changing rooms were burned to the ground. Mr. Salma has been working to rebuild the camp and has been using "his own expertise in construction to help design cabins and accessory structures that are fire smart." PSR ¶ 52.

Mr. Salma's impact on society is undeniable, as evidenced by the many letters submitted to the Court by grateful individuals and public entity representatives.

- "Laith has contributed more than your average volunteer…he has reached out to many of my participants over the years. His dedication to making their lives better extended beyond program hours. One of our participants, Dorothy, was very frail and had a difficult time traveling independently, Laith would go to her house twice a month to pick her up to go grocery shopping . . . he never let her pay! Over the years he and Dorothy became very close. He would take her to routine doctors' appointments and would act as her advocate because she had nobody else. . . . When Dorothy became terminally ill, it was Laith who took her to her Doctor's appointments, he was her advocate in the hospital through the entire process.

When she was unable to leave the hospital, he made regular visits and spent hours with her each time. He was the only one in her life, besides her sister, who was there with her at the end. I spoke with Dorothy in her last days and it was clear from her what an impact Laith was having on her in her final days." Kamphuis Letter, Exh. B.

- "About a year and a half ago Laith came to visit and asked me how things were going. I told him about my developmentally disabled son losing his rental housing and that the only thing we could find was going to involve me having to pay part of his rent which was going to be a hardship. Later, before he left Laith came and said he would help with a monthly contribution. I was stunned. What an amazing thing to offer. He arranged a contribution which helped us greatly and has been going. It made a huge difference for my son and me." Deanna Schwartz Letter, Exh. D.

- "But much more than a list of examples is the fact that Laith is here, regularly at our program. He is part of our community. When he walks into our greenhouse, there is always a welcoming and thunderous group hello, 'Laith!' He then proceeds to say hello to each individual, giving them a warm bear hug and seeing how each of them has been. He is someone the participants count on to continuously provide support and give his time to make our participants lives better. Laith's commitment to our participants is the best example of his true character. He has enriched all of their lives[.]" Sean Corritore Letter, Exh. C.

- "While many in San Francisco profess a desire to do something about the affordable housing crisis in our city, Mr. Salma represents the best example of a neighbor taking initiative and actually helping create homes for low-income tenants. By committing both his own financial resources – and his personal time and energy actually working on site – Mr. Salma did more than just write a check or spend a few hours volunteering. He invested himself in the lives of strangers in his community – while helping create a permanent home for them." Tyler McMillan Letter, Exh. G.

- "I first met Laith Salma a few years back at an event sponsored by Project Insight, a program of San Francisco Recreation and Parks Department for children and adults with disabilities. With mutual friends/colleagues I learned of Laith's tremendous dedication to volunteerism and his professional skills as a builder. With that knowledge I reached out to Laith when I asked for his help in rebuilding Enchanted Hills Camp for the Blind, located in Napa that was severely damaged by the Nuns Fire on October 8th, 2017. From my initial contact he did not hesitate with organizing his resources and contacts to help us with developing a rebuilding plan…. My experience with Laith has been nothing short of a gracious professional with a desire to volunteer his time and resources to help our organization….Laith demonstrates outstanding civic leadership and a compassion not found often enough in people." Anthony Fletcher Letter, Exh. V.

### 3. Probation's Recommendation

Throughout the PSR, Probation noted the extent and importance of Mr. Salma's dedication to community service.

> As an adult, the defendant is heavily involved in charitable organizations and lends his expertise to several projects that help the community. Notably, he is involved with a program called Project insight that helps disabled people, and he contributes to a program known as Marty's Place that helps provide homes for people suffering from HIV. Most recently, he has been volunteering and lending help to Enchanted Hills, which is a camp for blind youth that was affected by the Santa Rosa fires. He is spending his own money and time to help rebuild the camp.

PSR Sentencing Recommendation, pg. 2.

As a result, Probation recognized that Mr. Salma "is deeply involved in several notable charitable organizations and volunteer opportunities. This factor is presented to the Court to be considered for a variance below the guidelines range under 18 U.S.C. § 3553(a) – the defendant's personal history and characteristics." PSR ¶ 91.

## IV. NO UNWARRANTED SENTENCING DISPARITIES

A sentence of 18 months of probation only is appropriate here and would not result in any unwarranted sentencing disparities.

Mr. Salma's proposed sentence is "sufficient, but not greater than necessary" to serve the purposes of sentencing and is fair to this individual defendant, whose situation is both unique and extraordinary. 18 U.S.C. § 3553(a). "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Pepper v. United States*, 562 U.S. 476, 487 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)). "Underlying this tradition is the principle that 'the punishment should fit the offender and not merely the crime.'" *Id.* (quoting *Williams v. People of State of N.Y.*, 337 U.S. 241, 247 (1949)).

Moreover, a sentence of 18 months of probation is consistent with sentences imposed for similar conduct in other jurisdictions. In the Alameda County foreclosure auction cases, for

example, this Court's sister court took the view that certain factors warrant leniency in the form of a non-custodial sentence. *See, e.g., United States v. Silva*, Case No. 4:14-cr-00002-PJH, Dkt. 46 at 15:8-12 ("I've determined that people who have accepted responsibility, showed a willingness to make restitution if restitution is appropriate in their case, and who have cooperated with the Government in the investigation and prosecution of others warrant leniency…"). For the defendants who have accepted responsibility and provided thorough and truthful cooperation, the court in the Alameda cases imposed non-custodial sentences on all individuals who were: (1) first-time offenders, (2) expressed a willingness to pay restitution, and (3) otherwise presented a low risk of recidivism. *See United States v. Zepernick*, Case No. 4:14—cr-00512-PJH, Dkt. 33 at 15:13-23.

To the extent that the Court is intent on sentencing Mr. Salma to a period of home confinement, we respectfully request a sentence of 2 months with a modified 5 days per week of partial release. Mr. Salma would continue to be electronically-monitored during his days of partial confinement and would be back to his residence by 6 p.m. every evening.

**V.    CONCLUSION**

For the foregoing reasons, Defendant Laith Salma respectfully requests that the Court accept the Government's § 5K1.1 downward departure motion, accept the Probation Office's recommendation of a non-custodial sentence, and impose a sentence of 18 months of probation, a fine determined by the Court, and restitution in the amount of $6,193. Such a sentence is just, adequately addresses Mr. Salma's criminal conduct, and provides adequate deterrence and continued respect for the law.

Dated: April 19, 2018                           Respectfully submitted,

                                                DLA PIPER LLP (US)


                                                By:   */s/ Lisa Tenorio-Kutzkey*
                                                      LISA TENORIO-KUTZKEY
                                                      MANDY CHAN
                                                      Attorneys for Defendant Laith Salma